## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF GEORGIA ex rel. ERIC POWELL, M.D., | ) )<br>) |
| Plaintiff-Relator, | ) Case No. 2:20-cv-00102-RWS<br>) **JURY TRIAL DEMANDED** |
| v. | ) **FILED UNDER SEAL**<br>) |
| NORTHEAST GEORGIA HEALTH SYSTEM, INC. d/b/a NORTHEAST GEORGIA HEALTH SYSTEM; and NORTHEAST GEORGIA PHYSICIANS GROUP – URGENT CARE, LLC, | )<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

## COMPLAINT

1.      Relator Eric Powell, M.D., brings this action on behalf of himself, the

United States of America, and the State of Georgia against Defendants Northeast

Georgia Health System, Inc. d/b/a Northeast Georgia Health System; and

Northeast Georgia Physicians Group – Urgent Care, LLC (hereinafter collectively

"NGHS") for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*,

and of the Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168.1 *et seq.*

(collectively, the "False Claims Act").

2.      During an international pandemic, NGHS saw an opportunity to pad its

bottom line by requiring its providers to perform and bill for a medically

unnecessary and unreasonable Evaluation/Management (E/M) service for patients waiting in a drive-thru line to get tested for COVID-19 testing.

3.      NGHS required these same providers to reuse personal protective equipment (PPE), such as gowns, and to wear N95 masks that were not properly fitted.

4.      In Relator's professional opinion, not only was the E/M service medically unreasonable and unnecessary, but it was contraindicated because the close contact while wearing ineffective PPE put the providers and the patients at increased risk of spreading the virus to one another.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and (b) and 28 U.S.C. §§ 1331, 1345.

6.      Venue is proper in this district under 28 U.S.C. §§ 1391(b) and 31 U.S.C. § 3732(a), as Defendants transact business in this jurisdiction and violations of the False Claims Act described herein occurred in this district.

## GOVERNMENT HEALTHCARE PROGRAMS

7.      Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.,* establishes the Health Insurance for the Aged and Disabled Program, also known as Medicare. The United States Department of Health and Human Services ("HHS")

administers the Medicare Program through the Centers for Medicare and Medicaid Services ("CMS").

8.      The Medicare program is comprised of four parts. Medicare Part A provides basic insurance for the costs of hospitalization and post-hospitalization care. 42 U.S.C. §§ 1395c-i-5. Medicare Part B covers medical services and equipment such as outpatient care, medical supplies, and laboratory services. 42 U.S.C. §§ 1395j-w-5. Separate payments are made for each Current Procedures Terminology ("CPT") and Healthcare Common Procedure Coding System ("HCPCS") code listed on the Medicare Part B claims. *See* 45 C.F.R. §§ 162.1000, 162.1002, 162.1011, adopting the HCPCS as maintained and distributed by HHS, and the Current Procedural Terminology Coding Manual published by the American Medical Association (the "CPT Manual"). Medicare Part C, also known as Medicare Advantage, is a plan offered by private insurers that contract with Medicare to provide Part A and Part B benefits. 42 U.S.C. §§ 1395w-21-w-28. Medicare Part D is a plan offered by private insurers approved by Medicare to provide basic insurance for prescription drugs. 42 U.S.C. §§ 1395w-101-w-154.

9.      Providers who wish to be eligible to obtain Medicare reimbursement must certify, *inter alia*, that they agree to comply with the Medicare laws, regulations and program instructions that apply to them, and that they acknowledge, *inter*

*alia*, that payment of claims by Medicare is conditioned upon the claim and the underlying transaction complying with all applicable laws, regulations, and program instructions. *See, e.g.,* Form CMS-855A (for institutional providers); Form CMS-855S, at 24 (for certain suppliers); Form CMS-855I (for physicians and non-physician practitioners).

10.    Claims submitted by healthcare providers to Medicare contain similar representations and certifications. *See, e.g.,* Forms CMS-1500 (paper provider claim form; 837P (electronic version of form 1500); 1450 (UB04 – institutional provider paper claim form); 837I (electronic version of form 1450). When submitting a claim for payment, a provider does so subject to and under the terms of his certification to the United States that the services were delivered in accordance with federal law, including, for example, the relevant Medicare laws and regulations. Medicare requires compliance with these certifications as a material condition of payment, and claims that violate these certifications are false or fraudulent claims under the False Claims Act.

11.    Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, *et seq.*, establishes the Medicaid program, a federally assisted grant program for the States. Medicaid enables the States to provide medical assistance and related services to needy individuals. CMS administers Medicaid on the federal level. Within broad

federal rules, however, each state decides who is eligible for Medicaid, the

services covered, payment levels for services, and administrative and operational

procedures.

12.     At all times relevant to this Complaint, the United States provided funds

to the States through the Medicaid program pursuant to Title XIX of the Social

Security Act, 42 U.S.C. §§ 1396, *et seq.* Enrolled providers of medical services to

Medicaid recipients are eligible for payment for covered medical services under

the provisions of Title XIX of the 1965 Amendments to the Federal Social Security

Act.

13.     Together, the programs described above, and any other government-

funded healthcare programs, are referred to herein as "Government Healthcare

Programs."

## SERVICES MUST BE MEDICALLY NECESSARY AND PERFORMED ECONOMICALLY

14.     Reimbursement practices under all Government Healthcare Programs

closely align with the rules and regulations governing Medicare reimbursement.

The most basic reimbursement requirement under Medicare, Medicaid, and

other Government Healthcare Programs is that the service or item provided must

be reasonable and medically necessary. *See, e.g.,* 42 U.S.C. § 1395y(a)(1)(A)

(Medicare does not cover items or services that "are not reasonable and

necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."); 5 U.S.C. § 8902(n)(1)(A) (FEHBP will not cover any treatment or surgery that is not medically necessary); 32 C.F.R. § 199.6(a)(5) (TRICARE provider has an obligation to provide services and supplies at only the appropriate level and "only when and to the extent medically necessary."); 42 C.F.R. §§ 411.15(k)(1), 411.406; *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232 (11th Cir. 2011) ("Although the standard of 'medical necessity' is not explicitly denoted in the Medicaid Act, it has become a judicially accepted component of the federal legislative scheme."); *U.S. v. Rutgard*, 116 F.3d 1270, 1275-76 (9th Cir. 1997) (holding that TRICARE and the Railroad Retirement Health Insurance Program follow the same rules and regulations as Medicare).

15.     Healthcare providers must certify that services or items ordered or provided to patients will be provided "economically and only when, and to the extent, medically necessary" and "will be of a quality which meets professionally recognized standards of health care" and "will be supported by evidence of medical necessity and quality." 42 U.S.C. § 1320c-5(a)(1)-(3) see also 32 C.F.R. § 199.6(a)(5) (TRICARE services and supplies must "meet[] professionally recognized standards of health care [and be] supported by adequate medical documentation . . . to evidence the medical necessity and quality of services

furnished, as well as the appropriateness of the level of care").

16.     These requirements prohibit defendants from manipulating billing procedures in "an intentionally wasteful manner" that maximizes their own economic benefit while providing no patient benefit. *U.S. ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F. Supp. 2d 35, 41-42 (D. Mass. 2000). Thus, "while there is no requirement that the least costly alternative treatment be used," requests for payment become false when they are the result of "policies to artificially (i.e., unreasonably and unnecessarily) increase the quantity of items and amount of services provided to their patients without regard to medical necessity." *U.S. ex rel. Vainer v. Davita, Inc.*, 2012 WL 12832381, at *6 (N.D. Ga. Mar. 2, 2012).

17.     Providers who wish to be eligible to obtain Medicare reimbursement must certify, *inter alia*, that they agree to comply with the Medicare laws, regulations and program instructions that apply to them, and that they acknowledge, *inter alia*, that payment of claims by Medicare is conditioned upon the claim and the underlying transaction complying with all applicable laws, regulations, and program instructions. *See, e.g.*, Form CMS-855A (for institutional providers); Form CMS-855S, at 24 (for certain suppliers); Form CMS-855I (for physicians and non-physician practitioners).

18.     Claims submitted by healthcare providers to Government Healthcare Programs contain similar representations and certifications. *See, e.g.*, Forms CMS-1500 (paper provider claim form used for Medicare, Medicaid, TRICARE, FEHBP and OWCP); 837P (electronic version of form 1500); 1450 (UB04 – institutional provider paper claim form used for Medicare and Medicaid); 837I (electronic version of form 1450). When submitting a claim for payment, a provider does so subject to and under the terms of his certification to the United States that the services were delivered in accordance with federal law, including, for example, the relevant Government Healthcare Program laws and regulations. Government Healthcare Programs require compliance with these certifications as a material condition of payment, and claims that violate these certifications are false or fraudulent claims under the False Claims Act. CMS, its fiscal agents, and relevant State health agencies will not pay claims for medically unnecessary services or claims for services provided in violation of relevant state or federal laws.

## PARTIES

19.     Defendant Northeast Georgia Health System, Inc. d/b/a Northeast Georgia Health System owns and operates seven urgent care locations, in Braselton, Buford, Cleveland, Dacula, Dahlonega, Dawsonville, and Gainesville, Georgia.

20.    Defendant Northeast Georgia Physicians Group – Urgent Care, LLC ("NGPG") employs the urgent care provider who perform medical services at those urgent care locations.

21.    Both defendants are registered with the Georgia Secretary of State with a principal address of 743 Spring Street, Gainesville, GA 30501.

22.    Relator Eric Powell, M.D., was employed by Defendant NGPG as a physician at NGHS's Cleveland urgent care location from approximately July 9, 2018 until he was forced to resign on April 21, 2020.

## FACTUAL ALLEGATIONS

23.    As of April 20, 2020, nearly 20,000 Georgia residents had a confirmed diagnosis of COVID-19 and approximately 700-800 Georgia residents had died from the disease.

24.    According to a report issued by the Northeast Georgia Health System, as of April 20, 2020, approximately 111 individuals were confirmed positive for COVID-19 at its various hospitals and longterm care facilities, 79 patients were awaiting test results, and 15 patients had been killed by COVID-19.[1]

---

[1] Northeast Georgia Health System Sharing COVID-19 Data as Regional Peak Not Yet Reached, available at https://www.nghs.com/northeast-georgia-health-system-sharing-covid-19-data-as-regional-peak-not-yet-reached (last accessed April 21, 2020).

25.     As a result of this highly contagious and lethal virus, the entire state of

Georgia has been subject to a stay-at-home order since April 3, 2020. Decisions to

lift the stay-at-home order and to relax social distancing are premised in large

part on the number of tests being performed and diagnoses confirmed.

Accordingly, medical experts are generally in agreement that short of a vaccine,

comprehensive testing is the most important factor in slowing the spread of the

virus, as it will allow those who test positive to self-quarantine and contain the

disease.

26.     NGHS began performing drive-thru COVID-19 testing at its urgent care

facilities in or about mid-March 2020.

27.     Drive-thru COVID-19 testing allows patients to remain isolated in their

vehicles and have minimal contact with the provider, limiting their exposure to

others and thus the spread of the virus.

28.     NGHS management directed Dr. Eric Powell and three midlevel providers

to perform the drive-thru testing at the Cleveland facility.

29.     The Cleveland facility averaged approximately 15-20 COVID-19 tests per

day, but the larger facilities averaged closer to 100 COVID-19 tests per day.

30.     Although many of the patients seeking the COVID-19 test had already

been triaged by medical care professionals and came to the urgent care facilities

just for a drive-thru test to confirm the diagnosis, NGHS management instructed its providers to perform a detailed examination and bill for an E/M service for every patient that sought a COVID-19 test, without regard for individual medical necessity.

31.    As part of the E/M service, the providers were required to perform a physical and history, which they documented in NGHS's electronic health records system Epic on a laptop. The providers also had to check the patients' vitals and listen to their lungs through a stethoscope.

32.    The providers were then required to select a CPT Code for an E/M service in the Epic system.

33.    Once a code is entered into Epic, it is sent to NGHS's billing department, who reviews the codes and submits claims to payors, including Federal Healthcare Programs.

34.    It was Relator's understanding from prior discussions with management that NGHS expected him to code each examination as at least a Level 4 E/M, and so he generally selected 99204 for a new patient or 99214 for an established patient.

35.    For example, early in his tenure, on one occasion that Dr. Powell billed a visit as a Level 3 E/M, the Cleveland clinic manager approached Dr. Powell with

a copy of his patient notes and told him that he should have billed the visit as a higher paying Level 4 E/M. To Relator's knowledge, the Cleveland clinic manager had little to no experience or training with medical coding, and so this instruction must have come from NGHS management. Dr. Powell, who has decades of experience as a physician and proper billing practices, including as the head of a large urgent care group, vehemently disagreed with this finding. Nevertheless, Dr. Powell was instructed to sign a document stating that he permitted the service to be billed as a Level 4 visit. This happened again with another patient and E/M code shortly thereafter.

36.     Upon information and belief, NGHS management similarly pressures providers at the other urgent care or outpatient facilities to bill E/M at high levels.

37.     Despite Relator's repeated requests, NGHS declined to provide the drive-thru testing providers with adequate functioning personal protective equipment (PPE), such as gowns and N95 masks.

38.     Clean and functional PPE is necessary not only to protect the provider, but also to protect patients.

39.     For example, on his first day working the drive-thru testing facility, Dr. Powell was given an N95 mask that was two sizes two small and lacked the adjustable nose clip.

40.     Dr. Powell was not permitted to have a "fit test" to ensure he had an N95 mask that actually fit and worked properly on him.

41.     Dr. Powell was forced to re-use his gowns for multiple patients without them being properly sterilized.

42.     The NGHS providers working at the drive-thru testing sites also received no training on proper use of PPE.

43.     While the lack of PPE would have been problematic even had the providers simply been performing the COVID-19 testing, the additional requirement of a Level 3 examination meant that the providers were leaning into the cars, touching them and coming in close proximity with the patient, while wearing inadequate PPE.

44.     The E/M service was not only medically unnecessary and unreasonable, but the mandate that it be performed on every patient who received drive-thru testing put them at enhanced risk of contracting COVID-19 as it potentially increased their exposure to the virus.

45.     NGHS knowingly risked exposing hundreds of patients to COVID-19 just so that it could bill for an examination along with each test, in the process delaying hundreds of other patients from receiving timely tests, and nickel-and-diming the providers by refusing to give them the proper equipment to maintain their own safety and the safety of their patients.

46.     On April 8, 2020, Dr. Powell and his staff examined approximately 15-20 patients at the Cleveland facility drive-thru testing.

47.     On April 10, 2020, NGHS informed Dr. Powell that two of those patients had tested positive for COVID-19.

48.     Realizing that the defective and reused PPE offered minimal protection and so he himself might now be a carrier, Dr. Powell emailed his clinic manager, noting that he had been required to reuse masks and gowns to the point that they were ineffective (if not dangerous), and requested permission to go into the CDC-recommended 14-day quarantine.

49.     The clinic manager forwarded Dr. Powell's email to the Urgent Care administrative director and other NGPG managers, who denied his request and told him to go back to work testing dozens of high-risk patients.

50.     Relator protested that this instruction did not follow CDC guidelines and put providers and patients at risk, particularly as they were being required to reuse PPE when testing patients.

51.     Dr. Antonio Rios—NGPG's Executive Physician—responded that everyone was expected to abide by NGHS's established guidelines, which included reusing PPE.

52.     This was not true, as NGHS's guidelines for reusing isolation gowns, which had been written by its own infectious disease specialist, required that gowns only be reused after having been reprocessed and properly disinfected.

53.     Relator replied that he would practice proper PPE usage until his supplies were gone and again objected that NGHS was putting people in harm's way by not following CDC guidelines.

54.     The next day, April 11, 2020, the Cleveland clinic manager approached Dr. Powell and told him that "if you like your job, you'll do what they say."

55.     Around noon on April 11, 2020, Dr. Rios arrived at the Cleveland facility and told Dr. Powell he as being put on administrative leave. When Dr. Powell objected that the reusing of and ill-fitting PPE constituted an unsafe work environment, Dr. Rios again dismissed his concerns and told him was he "not following hospital policy."

56.     On April 15, 2020, Relator participated in a NGPG videoconference to discuss the situation. On this videoconference, various doctors remarked that the physicians in the hospital were reusing gowns after treating COVID-19 patients when examining non-COVID-19 patients.

57.     When Relator objected that they were risking patients' lives, NGPG CEO Daniel Tuffy told Relator he had three options: do was he was told, take a demotion, or resign.

58.     The morning of April 21, 2020, Relator had a call with NGHS management, during which it chastised him for refusing to reuse PPE and perform testing under these conditions.

59.     As Relator had been given no choice but to accept a demotion, resign, or agree to defraud the Government while putting patient lives at risk, Relator resigned.

## COUNT I
## VIOLATIONS OF 31 U.S.C. § 3729–FEDERAL FCA

60.     Relator hereby incorporates and realleges herein all other paragraphs as if fully set forth herein.

61.     As set forth above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

62.     Due to Defendants' conduct, the United States Government has suffered substantial monetary damages and is entitled to recover treble damages and a civil penalty for each false claim. 31 U.S.C. § 3729.

63.     Relator is entitled to reasonable attorneys' fees, costs, and expenses. 31 U.S.C. § 3730(d)(1).

## COUNT II
## VIOLATION OF GA. CODE ANN. § 49-4-168.1 - GEORGIA FALSE MEDICAID CLAIMS ACT

64.     Relator hereby incorporates and realleges herein all other paragraphs as if fully set forth herein.

65.     As set forth above, Defendants knowingly presented or caused to be presented to the Georgia Medicaid program false or fraudulent claims for payment or approval, in violation of Ga. Code Ann. § 49-4-168.1(a)(1).

66.     Due to Defendants' conduct, the State of Georgia has suffered substantial monetary damages and is entitled to recover treble damages and a civil penalty for each false claim. Ga. Code Ann. § 49-4-168.1.

67.     Relator is entitled to reasonable attorneys' fees, costs, and expenses. Ga.

Code Ann. § 49-4-168.2(i).

## COUNT III
## VIOLATION OF 31 U.S.C. § 3730 – RETALIATION

68.     Relator incorporates and realleges herein all other paragraphs as if fully set

forth herein.

69.     Defendant Northeast Georgia Physicians Group – Urgent Care, LLC

violated Relator's rights pursuant to 31 U.S.C. § 3730(h) by retaliating against

him for lawful acts done by him in furtherance an action under the federal False

Claims Act and other efforts to stop one or more violations of the federal False

Claims Act.

70.     As a result of Defendant's actions, Relator has suffered damages in an

amount to be shown at trial.

## COUNT IV
## VIOLATION OF GA. CODE ANN. § 49-4-168.4 – RETALIATION

71.     Relator incorporates and realleges herein all other paragraphs as if fully set

forth herein.

72.     Defendant Northeast Georgia Physicians Group – Urgent Care, LLC

violated Relator's rights pursuant to Ga. Code Ann. § 49-4-168.4 by retaliating

against Relator for lawful acts done by him in furtherance of an action under this

section or other efforts to stop one or more violations of the Georgia False

Medicaid Claims Act.

73.    As a result of Defendant's actions, Relator has suffered damages in an

amount to be shown at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against Defendant:

(a) awarding the United States and state of Georgia treble damages

sustained by them for each of the false claims;

(b) awarding the United States and state of Georgia a maximum civil

penalty for each of the false claims;

(c) awarding Relator the maximum share of the proceeds of this action

and any alternate remedy or the settlement of any such claim;

(d) awarding Relator all relief available, including special damages,

resulting from retaliation pursuant to 31 U.S.C. § 3730(h) and Ga.

Code Ann. § 49-4-168.4;

(e) awarding Relator litigation costs and reasonable attorneys' fees;

(f)  granting such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Relator hereby respectfully demands trial by jury on all issues and counts triable as of right before a jury.

Respectfully submitted,

Julie Bracker
Georgia Bar No. 073803
Jason Marcus
Georgia Bar No. 949698
**Bracker & Marcus LLC**
3225 Shallowford Road, Suite 1120
Marietta, Georgia 30062
Telephone: (770) 988-5035
Facsimile: (678) 648-5544
Julie@fcacounsel.com
Jason@fcacounsel.com